Aramais KHACHATURYAN, Petitioner,

v.

John D. ASHCROFT, Respondent.

No. 03–1297.

United States Court of Appeals, Seventh Circuit.

Argued Dec. 4, 2003.

Decided Jan. 23, 2004.

---

* After an examination of the briefs and the record, we have concluded that oral argument is unnecessary. Thus, the appeal is submitted on the briefs and the record. *See* Fed. R.App. P. 34(a)(2).

Vard R. Johnson, Broom, Johnson, Clarkson & Lanphier, Omaha, NE, for Petitioner.

Jennifer A. Parker, Department of Justice, Civil Division, Immigration Litigation, Washington, DC, for Respondent.

Before BAUER, EASTERBROOK, and EVANS, Circuit Judges.

## ORDER

Aramais Khachaturyan, a citizen of Kazakhstan who is half Russian and half Armenian, appeals the denial of his petition for asylum. The petition was denied, after a hearing, when an immigration judge (IJ) concluded that Khachaturyan failed to demonstrate that he was persecuted in the past or would suffer persecution in the future if he was forced to return to his native land. The Board of Immigration Appeals (BIA) summarily affirmed the IJ's decision. Our task is to decide whether substantial evidence supports the IJ's finding that Khachaturyan, who was 23 years old at the time of his hearing in 2001, failed to meet his burden of proving that several fights with school children when he was 15 years old (and the beating of his father and the vandalizing of his father's auto shop in 1995) rose to the level of "persecution" within the meaning of the Immigration and Nationality Act (INA) and whether evidence of conditions in Ka-

zakhstan compels a finding that he has a well-founded fear of persecution or torture if he is compelled to return there.

To be eligible for asylum, Khachaturyan must establish "refugee" status, i.e., that he is an alien unwilling or unable to return to his home country "because of ... a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A); *INS v. Elias–Zacarias,* 502 U.S. 478, 481, 112 S.Ct. 812, 117 L.Ed.2d 38 (1991). He can meet this burden by proving either (1) that he suffered past persecution on account of one of the enumerated categories, creating a rebuttable presumption of future persecution, or (2) that he has a well-founded fear of future persecution on account of one of the enumerated categories. *Yadegar–Sargis v. INS,* 297 F.3d 596, 601–02 (7th Cir. 2002); *Toptchev v. INS,* 295 F.3d 714, 720 (7th Cir.2002).

Although "persecution" is not statutorily defined, we have said it "means more than plain harassment and may arise from actions such as 'detention, arrest, interrogation, prosecution, imprisonment, illegal searches, confiscation of property, surveillance, beatings, or torture.' " *Tesfu v. Ashcroft,* 322 F.3d 477, 481 (7th Cir.2003) (quoting *Mitev v. INS,* 67 F.3d 1325, 1330 (7th Cir.1995)). Persecution can also include threats of "death, imprisonment, or the infliction of substantial harm or suffering." *Sharif v. INS,* 87 F.3d 932, 935 (7th Cir.1996).

A well-founded fear of future persecution must be both subjectively genuine and objectively reasonable. *Mousa v. INS,* 223 F.3d 425, 430 (7th Cir.2000). To establish the objective reasonableness of the fear, Khachaturyan must show, based upon credible evidence, that a reasonable person in the same circumstances would fear persecution if returned to the petitioner's native country. *Bhatt v. Reno,* 172 F.3d 978, 982 (7th Cir.1999). With these standards in mind, we turn to the facts, starting with a brief comment on conditions in Kazakhstan.

Kazakhstan is a central Asian nation of about 15 million people. Long a part of first the Russian Empire and then the Soviet Union, the country gained its independence in 1991. Today, about half of the country are Kazakhs and about a third are ethnic Slavs (*e.g.,* Russians, Ukranians, and Belarusians). Other ethnicities are also represented. In its first year of independence the Kazakhstan government conducted an explicit "Kazakhification" campaign. U.S. Department of State: "Kazakhstan Country Report on Human Rights Practices for 2002." The government has, however, abandoned this campaign and President Nazarbayev has publically stated that all nationalities are welcome. Nevertheless, the state does continue to discriminate in favor of ethnic Kazakhs in regard to housing, education, and employment. *Id.*

Based on these circumstances, as an ethnic minority, growing up in Kazakhstan was not easy for Khachaturyan. He testified that in 1986 (when he was 8 years old) Kazakh nationals demonstrated in the town where he lived. They threatened non-Kazakhs, and Khachaturyan's father removed him from school for his safety. After the country severed its ties to the Soviet Union, conditions became worse. Khachaturyan relates three incidents in which other children fought with him because of his nationality. In 1992, when he was 15 years old, he was pushed, kicked, and hit by Kazakh children who called him a Russian and told him to leave Kazakhstan. Ten months later, Kazakh national children again beat him. These incidents were not serious enough, however,

that he required medical attention. In May 1994, Kazakh children called him an "invader" and again fought with him because of his nationality. He received medical treatment but was not hospitalized.

The IJ also heard testimony regarding discrimination directed towards Khachaturyan's parents. In 1992, following the country's independence, Khachaturyan's mother, Galina, who had a sales job, was threatened with demotion. Her boss never mentioned the reason for the demotion; however, Khachaturyan testified that it was "obvious" that it was because she was not Kazakh. She quit instead of taking the demotion and did not find another job during the following 4 years the family remained in the country.

Khachaturyan's father, Boris, was a video engineer for 6 years in a state-run enterprise. In 1993, according to Khachaturyan, coworkers directed ethnic slurs towards Boris and told him that a native Kazakh should have his job. When Boris complained to his boss, his boss told him that it would be best if he quit his job. After that incident Boris was unable to find employment, so he opened an auto shop with an Armenian friend. In March 1994, four "Kazakh patriots" approached Boris and demanded that he either close his shop or transfer the business to a Kazakh national. Boris did neither, keeping the shop open. Over a year later, in May 1995, Khachaturyan testified, men came, damaged the shop, and put up posters stating "Armenian scum, out." Several days later, nationals beat Boris's partner. Boris called for medical attention and the police, who investigated and promised assistance. When the police left, however, the same men returned, beat Boris, and told him that they wanted to take over the business. According to Khachaturyan, this incident led his family to leave Kazakhstan.

On June 29, 1995, Khachaturyan came to the United States with his mother as a nonimmigrant visitor with authorization to remain in the United States for 6 months. A week after arriving, they entered Canada, where his father and sister joined them. The family applied for asylum in Canada but were denied. During this time, Khachaturyan's father died and his mother and sister went to Colombia. In 1998, Canada deported Khachaturyan to the United States pursuant to a reciprocal agreement between the two countries. Khachaturyan subsequently requested asylum in the United States. The IJ found him removable and denied his request for asylum. The BIA affirmed, without opinion, the IJ's decision. This petition for review followed.

■ Examining the facts, substantial evidence supports the IJ's holding that Khachaturyan failed to establish past persecution. We do find it serious that Khachaturyan was beaten because of his ethnicity. However, we have emphasized that allegations "must rise above the level of mere harassment in order to constitute persecution." *Ambati v. Reno*, 233 F.3d 1054, 1060 (7th Cir.2000). Here, considering that he did not need medical treatment after two of the fights, and after the third one did not need to spend the night at the hospital, we cannot say that the beatings Khachaturyan received rise to such a level. *See, e.g., Meghani v. INS*, 236 F.3d 843, 847 (7th Cir.2001) (beating in which petitioner's wrist and shoulder were broken did not rise to level of persecution); *Bhatt v. Reno*, 172 F.3d 978, 982 (7th Cir.1999) (without further evidence regarding the severity of beatings, the petitioner's testimony regarding harm he received was "too vague, speculative and insubstantial to establish either past or future persecution"); *cf. Asani v. INS*, 154 F.3d 719, 725 (7th Cir.1998) (stating that "it is likely that the

events described by Asani—being beaten resulting in the loss of two teeth, deprived of food and water, detained in a cell with no room to sit, and chained to a radiator—are sufficiently serious to rise beyond the level of mere harassment"). Thus, we agree with the IJ that Khachaturyan failed to meet his burden of establishing past persecution based on the beatings he received.

We next turn to the evidence presented regarding Khachaturyan's mother and father. Even if past persecution of family members counts as persecution of the applicant, *cf. Tamas–Mercea v. Reno*, 222 F.3d 417, 424 (7th Cir.2000) (rejecting "derivative persecution" claim where, even though the petitioner suffered some economic harm and personal humiliation, it was other family members, not the petitioner, who suffered persecution because of their political beliefs), neither the facts relating to his mother or father support such a finding. To begin, as the IJ concluded, the circumstances surrounding Khachaturyan's mother's job loss are unclear. While Khachaturyan testified that it was "obvious" it was because she was not a Khazkh national, there is no evidence in the record to support this charge. With respect to his father, the evidence establishes that Kazakh nationals destroyed his father's auto shop and beat his father and his father's partner. Significantly, however, his father contacted the police, who came to the shop with an ambulance and took his father's partner to the hospital. Khachaturyan has pointed to no evidence that the police were unwilling to further protect his father. Although a finding of persecution does not require that the government actually perpetrate or incite the attack, an applicant must show that the government "condoned it or at least demonstrated a complete helplessness to protect the victims." *Galina v. INS*, 213 F.3d 955, 958 (7th Cir.2000). *Roman v. INS*,

233 F.3d, 1027 (7th Cir.2000), is illustrative. There, after the overthrow of Ceausescu in Romania, the petitioner, a political activist, was subjected to repeated threats and harassment. However, we emphasized that "the connection to the government [was] unclear." There was no evidence that the petitioner reported the threats or harassment to the police or requested protection and, if so, "whether that effort was in vain." *Id.* at 1035. Like the petitioner in *Roman*, Khachaturyan presented no evidence that the government either orchestrated or sanctioned actions against his father or his father's partner. While it is terrible that this incident led the family to leave Kazakhstan, it does not rise to the level of persecution required under the immigration statute.

▇ Furthermore, Khachaturyan has presented no evidence to show that he would fear for his safety if he is returned to Kazakhstan. We are conscious of the discrimination that continues to exist in Kazakhstan towards ethnic minorities. However, general conditions that affect the population as a whole will not support asylum eligibility. We continue to recognize "the hard truth that unpleasant and even dangerous conditions do not necessarily rise to the level of persecution." *Mitev,* 67 F.3d at 1330. Moreover, we note that according to the State Department the country has largely abandoned its "Kazakhification" campaign of over a decade ago and has stated publicly that all nationalities are welcome. Accordingly, without more specific allegations that there is a reasonable possibility that Khachaturyan would be persecuted upon his return to Kazakhstan, *see, e.g., Bhatt v. Reno,* 172 F.3d 978, 982 (7th Cir.1999) (petitioner must show "specific, detailed facts supporting the reasonableness of [his] fear that [he] will be singled out for persecution") (internal citation omitted) we

cannot disturb the IJ's denial of Khachatu-ryan's asylum petition.

Finally, Khachuryan argues that the IJ improperly conditioned the grant of voluntary departure upon the posting of a $500 bond within 5 days of the judge's decision, rather than giving Khachaturyan 5 business days. However, he did not raise the issue on appeal to the Board of Immigration Appeals, and he has thus waived his argument. *See* 8 U.S.C. § 1252(d) (providing for judicial review of final orders where the alien has exhausted administrative remedies); *Mojsilovic v. INS,* 156 F.3d 743, 748 (7th Cir.1998) (an alien who fails to raise an issue below has not fulfilled the exhaustion requirement).

The petition for review is DENIED and the judgment of the BIA is AFFIRMED.